# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **DANIEL WHITAKER BLUESTEIN**, | Case No. 2:16-cv-1808-JE |
| Petitioner, | **OPINION AND ORDER** |
| v. | |
| **JERI TAYLOR**, | |
| Respondent. | |

Daniel Whitaker Bluestein, 16502295, Eastern Oregon Correctional Institution, 2500 Westgate, Pendleton, OR 97801. Petitioner *pro se*.

Ellen F. Rosenblum, Attorney General, and Kristen E. Boyd, Assistant Attorney General, Oregon Department of Justice, 1162 Court Street NE, Salem, OR 97310. Of Attorneys for Respondent.

**Michael H. Simon, District Judge.**

United States Magistrate Judge John Jelderks issued Findings and Recommendation in this case on September 18, 2017. ECF 34. Judge Jelderks recommended that Petitioner's petition for habeas corpus under 28 U.S.C. § 2254 be denied and that the Court decline to issue a Certificate of Appealability.

Under the Federal Magistrates Act ("Act"), the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." 28 U.S.C.

PAGE 1 – OPINION AND ORDER

§ 636(b)(1). If a party files objections to a magistrate's findings and recommendations, "the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *Id.*; Fed. R. Civ. P. 72(b)(3).

For those portions of a magistrate's findings and recommendations to which neither party has objected, the Act does not prescribe any standard of review. *See Thomas v. Arn*, 474 U.S. 140, 152 (1985) ("There is no indication that Congress, in enacting [the Act], intended to require a district judge to review a magistrate's report to which no objections are filed."); *United States. v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc) (holding that the court must review de novo magistrate's findings and recommendations if objection is made, "but not otherwise"). Although in the absence of objections no review is required, the Act "does not preclude further review by the district judge[] *sua sponte* . . . under a *de novo* or any other standard." *Thomas*, 474 U.S. at 154. Indeed, the Advisory Committee Notes to Fed. R. Civ. P. 72(b) recommend that "[w]hen no timely objection is filed," the Court review the magistrate's recommendations for "clear error on the face of the record."

Petitioner timely filed an objection. ECF 39. Petitioner attached new evidence to his objection. Respondent filed a response to the objection, and also argues that this Court should decline to exercise its discretion to consider the new evidence submitted by Petitioner. ECF 40. Petitioner filed a reply in further support of his objection. ECF 41.

Petitioner objects that the Findings and Recommendation erroneously applies the standard under *Schlup v. Delo*, 513 U.S. 298 (1995), in refusing to excuse Petitioner's procedural bar and allow Petitioner's arguments of constitutional deficiencies to be heard on the merits. Petitioner also objects to the recommendation that a Certificate of Appealability not be issued.

The Court exercises its discretion to consider the additional evidence provided by Petitioner with his objection. *See* 28 U.S.C. § 636(b)(1) (permitting a court to "receive further evidence" at its discretion); *United States v. Howell*, 231 F.3d 615, 621 (9th Cir. 2000) (discussing the Circuit split on whether a district court must or may consider new evidence when reviewing *de novo* a magistrate judge's findings and recommendation, and concluding that a district "has discretion, but is not required" to consider new evidence). Because the Court considers Petitioner's new evidence, the Findings and Recommendation's analysis regarding whether Petitioner has presented sufficient evidence under *Schlup* is no longer applicable. The Court conducts a *de novo* review (as it would regardless because Petitioner objected to the Findings and Recommendation).

**BACKGROUND**

The victim in this case testified that she met Petitioner in the waiting room at a medical facility on the day of the assault, July 20, 2006. She further testified that after Petitioner asked the victim out on a date, she turned him down and told him she was married. Petitioner then learned that the victim worked as a loan officer, and later that day Petitioner asked the victim to come to Petitioner's mother's apartment to discuss a possible mortgage loan. The victim arrived at the apartment building at approximately 4:02 p.m., holding only a cell phone, keys, and a water bottle. She testified that as soon as she entered the apartment, Petitioner immediately began sexually assaulting her.

The victim described how Petitioner moved the victim through the apartment, continuously assaulting her—backing her against the front door, moving her through hallways, backing her into the bathroom, pushing her against the sink, and laying her on the floor on several occasions, although never moving her into the bedroom. The victim testified that Petitioner raped the victim and at one point stated if she performed a certain sexual act on

PAGE 3 – OPINION AND ORDER

Petitioner he would let her leave. She performed that act. Petitioner then stepped away from the victim and told her she could leave and asked if he could call her. She responded in the affirmative so that he would allow her to leave. The victim also testified that Petitioner was naked. The victim gathered her clothing and quickly left before Petitioner changed his mind. The victim left the apartment building at approximately 4:50 p.m. Petitioner, although he did not testify at trial, argued that the evidence showed the encounter to be consensual.

Approximately seven hours after the assault, the victim went to the hospital. A sexual assault nurse examined the victim. At trial, the nurse described several brown bruises on the victim's inner right thigh and a bruise that was brown, purple, and slightly yellow above her right buttock. The nurse also discovered two three-centimeter abrasions on either side of the labia majora folds, a one-centimeter abrasion to the posterior fourchette, and redness and bleeding inside of the vagina and cervix. Although the examining nurse could not determine the age of the bruises, she opined that the victim's injuries were consistent with her account of sexual assault. Petitioner was convicted of rape, sodomy, and sexual abuse and sentenced to 140 months in prison. He seeks habeas relief relating to this underlying conviction.

## DISCUSSION

In his habeas petition, Petitioner asserts numerous constitutional errors. Petitioner, however, filed his petition after the one-year deadline established in 28 U.S.C. § 2244(d)(1)(A), and so he is procedurally barred from having his petition considered on the merits. Thus, he seeks to have his otherwise-barred claims considered on the merits under *Schlup*.

**A. Standard of Review under *Schlup***

Otherwise-barred claims may be considered on the merits by arguing a claim of "actual innocence" under the "narrow class of cases . . . implicating a fundamental miscarriage of justice." *Schlup*, 513 U.S. at 315. As the Ninth Circuit explained,

> The terminology in this area is sometimes confusing, because the "miscarriage of justice" exception, like the freestanding claim in *Herrera* [*v. Collins*, 506 U.S. 390 (1993)], has been described as a showing of "actual innocence." But unlike a *Herrera* claim, the "miscarriage of justice" exception is not an independent avenue to relief. Rather, if established, it functions as a "gateway," permitting a habeas petitioner to have considered on the merits claims of constitutional error that would otherwise be procedurally barred.

*Carriger v. Stewart*, 132 F.3d 463, 477 (9th Cir. 1997). The threshold for making out a *Schlup*-type of "'miscarriage of justice' exception is lower than the 'extraordinarily high' threshold for freestanding (*Herrera*) claims of innocence." *Id.*

"To make a successful claim under *Schlup*, 'a petitioner must show that in light of all the evidence, including new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *Cooper v. Woodford*, 358 F.3d 1117, 1119 (9th Cir. 2004) (quoting *Carriger*, 132 F.3d at 478). The court must make this "determination concerning the petitioner's innocence in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial." *Schlup*, 513 U.S. at 328 (quotation marks omitted). "In assessing the adequacy of petitioner's showing, therefore, the district court is not bound by the rules of admissibility that would govern at trial." *Id.* at 327. The court "must assess the probative force of the newly presented evidence in connection with the evidence of guilt adduced at trial," and "may consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence." *Id.* at 332. The required showing is procedural, not substantive, requiring a petitioner "to present 'evidence of innocence' such that 'a court cannot have confidence in the outcome of the trial.'" *Carriger*, 132 F.3d at 478 (quoting *Schlup*, 513 U.S. at 316).

## B. Petitioner's New Evidence

### 1. Evidence presented with the objections

Petitioner provides a printout from the website "bestremedyideas.com," from its "women's health" section, specifically a page titled "Vaginal Abrasions: Causes, Symptoms, Treatments, and Remedies." ECF 39 at 8. This particular page does not appear to have any author associated with it, nor any date other than the date it was printed by Petitioner. It notes that women can get vaginal abrasions from sexual intercourse, inserting tampons, or wearing underwear that is too tight.

Petitioner next provides a printout from the website "sciencenordic.com." ECF 39 at 10. This is an article titled "Voluntary sex causes as many injuries as rape," dated March 30, 2012, and is authored by Thomas Hoffmann. The article discusses a research study conducted by a Danish researcher, Birgitte Schmidt Astrup, comparing 39 rape victims and 110 nursing students. The study purportedly revealed that the nursing students engaging in consensual sexual intercourse experienced vaginal injuries of the same type and frequency as the rape victims (injuries in 36 percent of rape victims and 34 percent of nursing students), thereby undercutting such injuries as evidence of rape. The article reports that the study was published in the journal *Forensic Science International* and that it has already affected how Danish police investigate rape. Petitioner also includes Ms. Astrup's Linked-in profile. ECF 39 at 14.

Petitioner also provides a one-paragraph abstract of a December 2011 article titled "Nature, Frequency and Duration of Genital Lesions after Consensual Sexual Intercourse-Implications for Legal Proceedings," printed from the website "researchgate.net." ECF 39 at 12. This abstract explains that there was a study of 98 women "to make a normative description of the nature and duration of genital lesions sustained during consensual sexual intercourse." The study found lesions were "frequent," with 34 percent of participants having lesions visible to the

PAGE 6 – OPINION AND ORDER

naked eye, 49 percent seen with colposcopy, and 52 percent seen with toluidine blue dye and subsequent colposcopy.

Petitioner further provides an abstract on copulatory wounding. ECF 39 at 13. There is no website address or indication of the source of this abstract. It states that in humans, post-copulatory healing can be inferred because fewer wounds have been found 36 hours after injury than after zero to 24 hours. This abstract cites to studies from 2008, 2011, and 2012.

Petitioner also provides information that he apparently prepared himself, relating to intrauterine devices ("IUD"). ECF 39 at 15. He states that he compiled the information by researching the websites "webmd.com," "rxlist.com," and the FDA website. He lists types of IUDs and their purported side effects. Petitioner emphasizes that bleeding and vaginal discharge are side effects of all brands of IUDs.

Petitioner's next item of evidence is an article from the website "acepnow.com," dated February 6, 2014, authored by Ralph J. Riviello, MD, MS, FACEP, and titled "Can you Tell How Old this Bruise is Based on its Color?" ECF 39 at 16. This article states as its "key facts" that many factors are involved in the appearance of a bruise, that bruise appearances vary from person-to-person, that color progression is not absolute or accurate for timing, that emergency physicians should not definitively age a bruise, and that red and purple indicate a fresher bruise. Within the article, it notes that from red and purple bruises tend to progress to blue, then brown, yellow, or green. It also notes that "some" studies indicate that yellow will not appear in a bruise until at least 18-24 hours after an injury. But it states that "precise timing on color alone is simply not accurate." *Id.* at 17.

Petitioner also offers an article titled "Tell-Tale Color Changes: Camera Can Find Age of a Bruise," published in October 2012 and authored by Dr. Barbara Stam, Dr. Gerhard Holst, and

Ursula Buczek. ECF 39 at 18. This article explains that while dating bruises by color has been uncertain, a reliable method may be forthcoming in a new camera thanks largely to the work of Dr. Stam. The article notes generally that at four hours a bruise is predominantly red, at 24 hours it is predominantly blue, "a day later" yellow appears, after 74 hours yellow is the predominant color but blue is still visible, and after 121 hours only yellow is present. *Id.* at 19. But the article emphasizes that "dating injuries by using color tables is an imprecise method that cannot be used in court. Even technical processes have brought no advances up to now [with the new camera]." *Id.* at 18.

The final article submitted with Petitioner's objection is a printout from the website "www.ncjrs.gov" relating to recognizing when a child's injury is caused by abuse and, specifically, relating to bruises. ECF 39 at 22. It has no author and no date other than the date in 2017 when Petitioner printed the page. This page includes a table indicating the age of a bruise based on its color, with red at 0-2 days, blue at 2-5 days, green at 5-7 days, yellow at 7-10 days, and brown at 10-14 days.

### 2. Evidence presented with the Petition

With his Petition, Petitioner also provided new evidence that relates to his *Schlup* argument (in addition to evidence relating to his underlying constitutional claims). Petitioner offered a diagram of the apartment where the alleged crime occurred. ECF 20 at 19. Petitioner argues that although the jury was allowed a "brief tour" of the apartment, the "birds-eye" view shown in the diagram provides critical context as they relate to the activities described by the witnesses, because they refute the victim's testimony regarding how Petitioner allegedly moved the victim around the apartment.

Petitioner also provided a photograph of the doorways into the bedroom and the bathroom in the apartment. Petitioner argues that this evidence is relevant to show that it would

PAGE 8 – OPINION AND ORDER

have been just as easy to move the victim into the bedroom as it would have been to move her into the bathroom, thereby refuting the victim's testimony that the Petitioner did not move her into the bedroom but did move her into the bathroom. ECF 20 at 20.

The next set of exhibits relates to the bathroom, where the victim testified she was bent backward over the sink. These exhibits include photographs of the hallway to the bathroom, the bathroom vanity, and a close-up of the sink, along with a diagram of measurements of the human body.[1] ECF 20 at 25-28. Petitioner argues that this evidence is relevant to show that the activities in the bathroom could not have occurred as claimed by the victim in this small space.

In addition, Petitioner submits still photographs from the video of the victim entering and exiting the lobby of the apartment before and after the incident. ECF 20 at 29-34. These photographs were enhanced using software purportedly not available at the time of trial. Although the video was shown at the time of trial, Petitioner asserts that the photographs provide more detail and allow a jury to focus on the minor details that are unseen in the video.

Petitioner also submitted the affidavit of Ms. Diane Mills, an employee of the apartment building where the crime occurred, attesting that she was visible to the victim when the victim left the apartment, that she saw the victim leave the building after the crime, and that the victim did not appear distressed and did not ask for assistance. ECF 19 at 3. Ms. Mills further states that neither the defense nor the prosecution asked her at trial if she recognized the victim from the night of the alleged attack. The trial transcript reflects that Ms. Mills's testimony in her affidavit is new testimony.

---

[1] The Court notes that it appears that one exhibit that Petitioner intended to submit, Exhibit VD (a photograph of the bathroom sink with a tape measure from the front to the mirror), was inadvertently excluded from Petitioner's filing. Because the Court does not find that this exhibit would make a material difference, the fact that it is missing from the record is harmless.

Finally, Petitioner submitted evidence relating to the victim's religion. ECF 19 at 4-5. Petitioner provides a report from the Doddridge Detective Agency, hired by Petitioner's original criminal defense attorney, which appears to conclude that the victim was a member of the Church of Jesus Christ of Latter Day Saints ("LDS"). Petitioner also provides a declaration from his defense counsel, stating that the defense and prosecution reached a stipulation that neither party would introduce evidence relating to the religious affiliations of the defendant or the victim. Petitioner argues that evidence of the victim's religion was important evidence supplying the motive for her to lie regarding the consensual interaction between them, because she would be subject to significant repercussions from her church and religious community for committing adultery.

## C. Applying *Schlup* to Petitioner's Case

Petitioner argues that considering all of the evidence, both what was adduced at trial and the new evidence presented with his Petition and his objection, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt. Because Petitioner is proceeding *pro se*, the Court construes Petitioner's arguments liberally and affords Petitioner the benefit of any reasonable doubt regarding his arguments. *Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010).

Petitioner argues that the testimony of the sexual assault nurse is contradicted by Petitioner's new evidence. First, regarding the bruising, Petitioner asserts that Nurse Olson's testimony is contradicted by the articles he has submitted. These articles note that, although dating bruises is not precise, brown and yellow bruising indicates a bruise of anywhere from 18 hours to several days. Second, regarding the vaginal abrasions, Petitioner asserts that the recent studies and articles showing that abrasions occur at the same rate in consensual intercourse as in rape cases casts serious doubt on the persuasiveness of Nurse Olson's testimony that these

PAGE 10 – OPINION AND ORDER

injuries were consistent with sexual assault. Thus, argues Petitioner, the testimony of the nurse would not have assisted in persuading a jury beyond a reasonable doubt that a sexual assault occurred.

Petitioner also argues that the testimony of the victim is not credible in light of the new evidence and the evidence adduced at trial. Petitioner argues that the still photographs of the victim's exit from the building show that her demeanor, gait, hair, and appearance all remain unchanged from her entrance. This tends to refute the victim's testimony that she left in a hurry and in a distressed state. Petitioner asserts that the still photographs also show that the victim was still carrying her water bottle that she brought into the building.

The Court disagrees that the photographs, standing alone, are definitive. One photograph appears to show a water bottle in the victim's left hand. ECF 20 at 33. The next photograph, however, is less clear and the victim's left hand appears empty. *Id.* at 34. If the victim did have her water bottle in her hand, it would be somewhat inconsistent with her testimony that she did not know what happened to her water bottle and that she did not have anything in her hands other than her keys when she left the apartment. This would tend to contradict her testimony that she left quickly and in a state of fear that Petitioner was going to assault her again.

Petitioner argues that this evidence shows that a traumatizing assault did not just occur. This argument is further supported by the new testimony of Ms. Mills, who states that she was present in the lobby when the victim departed, was visible to the victim, and that the victim did not request assistance or appear distressed. The victim testified, however, that as she was leaving the apartment and exiting the building all she could think about was holding it together until she got to her car, that she was focused on making it to her car, and that she kept thinking she could fall apart as soon as she got into her car. The fact that she was relatively composed as she exited

the apartment building and did not stop to talk to or seek assistance from a stranger, Ms. Mills, is not inconsistent with this testimony.

Petitioner also asserts that the bathroom photographs show that the vanity has very sharp edges and that the bathroom is too small for the alleged activities. Petitioner argues that if he had forced the victim against the vanity and pushed her backward over the sink, as she testified, with enough force to cause bruising, there would have been some forensic evidence such as skin or hair left in the bathroom given the sharp edge of the vanity. Petitioner asserts that there is no such evidence. The Court notes, however, that investigators did not perform any forensic testing in the apartment. Accordingly, there is no proof of whether there was or was not forensic evidence on the sharp edges of the vanity as Petitioner asserts would have been present. Petitioner also argues that given his proportions and those of the victim, it is simply not logistically feasible for the position she described to fit in the space. The new evidence is not, however, conclusive on this point.

Petitioner asserts that the encounter was consensual and that the evidence, new (as discussed above) and adduced at trial, demonstrates as much. At trial it was adduced that although the victim asserted that she went to the apartment to meet Petitioner and his mother for the purpose of potentially working with Petitioner's mother on a refinance or mortgage, the victim did not bring a notepad, pen, computer, or any business paperwork. Nor did she confirm that the apartment had internet access to ensure she could receive emailed business paperwork or information were it to become necessary. It was further adduced that the victim and Petitioner communicated several times the day of the assault. They spoke at length at the medical office in the morning of the assault, followed by a 30 minute telephone call, a text message from Petitioner to the victim, and a few more brief telephone calls. The victim bought new clothes and

shoes later that day after meeting Petitioner and changed into them at the store before again meeting the Petitioner later in the afternoon. Although the victim testified that she had told her husband in the morning that a man had tried to "pick her up" at the doctor's office and they joked about it, just before entering Petitioner's mother's apartment at approximately 4:00 p.m. to meet with Petitioner, the victim spoke with her husband for nearly 20 minutes but did not tell him she was on her way to meet the same man who tried to "pick her up" and would meet him in his mother's apartment. The victim testified that she did not tell her husband this fact because she does not tell him all the details of her work day, that it was Petitioner who initiated the various contacts that day and continued the telephone conversation for 30 minutes, that the victim did not bring any paperwork or pen and paper to the meeting because she could remember details of Petitioner's mother's potential loan if needed and this was only an introductory meeting, and that the victim often buys news clothes and changes into them immediately.

Petitioner argues that the evidence regarding the victim's LDS religion provides a strong motive for her to lie about the encounter after-the-fact. Petitioner contends that this evidence about motive, in conjunction with the lack of physical evidence in the apartment, the communications between he and the victim, the victim's behavior leading up to the encounter, and the victim's calm behavior immediately after the alleged attack all show that the encounter was consensual.

Petitioner further argues that the "birds-eye" diagram and photographs of the doorways demonstrate that he could have as easily moved the victim to the bedroom as to the bathroom and thus this refutes her testimony that he could not move her in to the bedroom. The Court notes, however, that the victim did not testify that Petitioner "could not" move the victim into the bedroom, but merely that he did not move her into the bedroom, nor did he assault her on the

couch in the living room. The victim did not attempt to offer any explanation for why Petitioner chose to attack her against the wall, the floor (in various locations), and the bathroom sink.

The Court further notes that the evidence at trial was not as limited as discussed by Petitioner. Police officer Wendi Krause testified regarding the demeanor of the victim, both at the hospital when Ms. Krause arrived and at the site of the alleged attack when she had the victim return to the building. Officer Krause testified that at the hospital the victim's face was puffy like she had been crying and there were tears coming down her face. The officer further testified that the victim was shaking, was reluctant to go near the apartment when the officer took the victim to the apartment building to confirm the specific apartment of the scene of the crime, and appeared afraid. The sexual assault nurse Lucy Olson also testified that the victim was tearful at the hospital.

Detective Jeffrey Bender also testified regarding the victim's demeanor. He met with the victim the day after the alleged attack. He testified at trial that: "She was extremely emotional. We spent a good amount of time sort of consoling her. She cried a lot. Sobbed at times. And just seemed generally in a great deal of [emotional] pain." ECF 14-2 at 208. Detective Bender further testified regarding Petitioner's demeanor. Detective Bender testified that when he walked Petitioner from the detective division to the jail, a walk that general takes five minutes, it took nearly 25 minutes. This was because Petitioner bent over, drooped his shoulders, hung his head, shuffled his feet, walked extremely slowly, and mumbled, and drooled.

Shortly after leaving the apartment building where the attack occurred, starting at approximately 5:06 p.m., the victim made multiple phone calls trying to reach her friend Amber Murray. When she could not reach Ms. Murray, the victim called Ms. Murray's husband.

Ms. Murray and the victim finally connected around 5:17 p.m. and spoke for approximately 20 minutes.

Ms. Murray testified that based on the victim's tone and tenor, Ms. Murray inquired whether someone had died or whether something had happened to one of the victim's children because it was obvious that something terrible had happened. After Ms. Murray understood what had happened, she told the victim to pull over and that Ms. Murray would drive to her and take her somewhere. Ms. Murray testified that the victim was sobbing uncontrollably and that she had pulled her car over and was vomiting.

Ms. Murray had to take her children to a caregiver and then travel across town and was not able to arrive at the victim's house until around 8:00 p.m. Ms. Murray described the victim as huddled in bed, puffy from crying, and visibly upset. Ms. Murray talked with the victim, and Ms. Murray broke the news to the victim's husband about the incident. Ms. Murray then went to a neighbor's house because Ms. Murray knew the neighbor was a volunteer rape victim advocate. She returned with the neighbor and they convinced the victim to go to the hospital. Ms. Murray accompanied the victim to the hospital and stayed with her during most of the hospital visit and police interview.

Petitioner has offered new evidence that might cast some doubt on certain aspects of some of the testimony or evidence presented at trial. For example, Petitioner offers evidence that bruises with some yellow are, at a minimum, 18 hours old. But the bruise evidence submitted by Petitioner emphasizes how unreliable it is to show when a bruise occurred by viewing its color, which is what Nurse Olson explained at trial. Thus, the fact that one of the victim's bruises had some yellow is not particularly persuasive evidence of innocence.

Petitioner's evidence regarding vaginal abrasions calls into question conclusions that abrasions are evidence of rape. But the evidence submitted by Petitioner merely shows that abrasions occur at the same rate in rape as in consensual intercourse. The victim's abrasions are thus not inconsistent with rape, although the new evidence tends to show that they are also not proof of rape. Nurse Olson testified, however, that the victim's injuries were consistent with sexual assault. Petitioner's new evidence does not contradict that testimony.

Petitioner also offers a photograph that appears to show that the victim had her water bottle in her hand when she left the building. Although the victim testified that she did not know what happened to her water bottle, it is not unreasonable after a traumatic experience that a victim would not focus on a detail such as whether she grabbed a water bottle. The victim also originally testified that she left with nothing, then corrected that she must have had her keys. Defense counsel asked whether the victim had her cell phone, and she agreed that she must have taken her phone. It is not an unreasonable inference that her keys, cell phone, and water bottle were all together and she grabbed them all when she left. Moreover, the photographic evidence submitted by Petitioner is not conclusive, and the victim may not have had the water bottle in her hand. Thus, the water bottle issue is also not persuasive evidence of innocence. Additionally, there was significant additional evidence at trial from multiple witnesses of the victim appearing after the alleged incident as visibly upset, vomiting, sobbing uncontrollably, and deeply emotional. A jury could credit this other evidence of emotional distress over the fact that the victim was able to grab a water bottle as she left.

Similarly, as discussed above, the apartment photographs, the bathroom photographs, and the Petitioner's diagram are not persuasive of innocence because they do not contradict any evidence in the record or provide any new context. The victim did not testify that Petitioner tried

but was physically unable to maneuver her into the bedroom, and the police did not attempt and fail to obtain any forensic evidence.

Considering all of the evidence, including what was adduced at trial, the new evidence submitted by Petitioner to Judge Jelderks, and evidence newly submitted with Petitioner's objection, the Court does not conclude that it is more likely than not that *no* reasonable juror would have found petitioner guilty beyond a reasonable doubt. The Court recognizes that Petitioner may have some evidence and arguments for reasonable doubt, and perhaps a reasonable jury might find Petitioner not guilty if he were tried again with this new evidence. But that is not the standard under *Schlup*. The Court, nevertheless, will issue a Certificate of Appealability under 28 U.S.C. § 2253(c)(1) as to whether Petitioner has met the standard of "actual innocence" under *Schlup*.

## CONCLUSION

The conclusion of the Findings and Recommendation (ECF 34) is ADOPTED IN PART. Petitioner's Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 (ECF 2) is DENIED as untimely. A Certificate of Appealability under 28 U.S.C. § 2253(c)(1) is GRANTED as to whether Petitioner has met the standard of actual innocence under *Schlup v. Delo*, 513 U.S. 298 (1995).

**IT IS SO ORDERED**.

DATED this 25th day of January, 2018.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge